UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 3:14-cr-55-1(VLB) |
| | : | |
| OSCAR VALENTIN | : | |
| Defendant. | : | February 8, 2021 |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION DENYING DEFENDANT OSCAR VALENTIN'S MOTION FOR A REDUCTION OF SENTENCE, [Dkt. 327]

Before the Court is Defendant Oscar Valentin's renewed motion for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkt. 327].[1] Mr. Valentin seeks a modification of his sentence from incarceration to home confinement, or other reduction as the Court sees fit, based on his asserted risk of severe complications should he become re-infected by COVID-19 while incarcerated at FCI Loretto. [*Id.*]. The Government opposes Defendant's motion. [Dkts. 323, 332]. For reasons set forth below, the Court DENIES Defendant's motion.

---

[1] The Court previously denied Mr. Valentin's *pro se* motion for compassionate release. [Dkt. 324]. The Court granted Mr. Valentin's motion for reconsideration in order to consider arguments to be raised in a counseled motion. [Dkt. 326](Order granting Recons.)] This decision considers Defendant's counseled brief and accompanying exhibits.

1

**Background**

I. **Procedural History**

Although the Court recently summarized the procedural history of this case in its decision denying Mr. Valentin's motion to vacate his sentence pursuant to 28 U.S.C. § 2255, the Court will repeat the salient facts as they are germane to the Court's decision on Defendant's motion seeking re-sentencing. *See* [Dkt. 320 (Mem. of Decision Denying Def. Mot. to Vacate) at 2-8].

In April 2013, Mr. Valentin was arrested pursuant to a criminal complaint in the matter of *United States v. Oscar Valentin*, 13-cr-71-21, along with twenty-one co-defendants involved in a narcotics distribution conspiracy in New London, Connecticut for conspiracy to distribute and possession with intent to distribute cocaine in violation of 28 U.S.C. § 841(b)(1)(B)(ii), of which 500 grams or more were attributed to Mr. Valentin and Mr. Collazo Garcia based on their alleged criminal activities. [13-cr-71-21, Dkt. 19, (Indictment) ¶¶ 10-12].

In March 2014, the Government moved to dismiss the indictment as to Oscar Valentin pursuant to Fed. R. Crim. P. 48(a), as Mr. Valentin, together with Nestor Pagan, and Andrew Aviles, where charged with violation of the Travel Act, 18 U.S.C. § 1952(a), Conspiracy to Commit a Violent Crime in Aid of Racketeering ("VCAR"), 18 U.S.C. § 1959(a)(6), and VCAR assault, 18 U.S.C. § 1959(a)(3) arising from the commission of a fatal assault against Javier Reyes in September 2012 in New London, Connecticut. [Dkt. 1 (Indictment) Counts 1-3]. The indictment also charged Mr. Valentin and Mr. Pagan with conspiracy to distribute and possession with intent to distribute over 500 grams of cocaine. *Id.*, Count 4. After a fourteen-

day trial, Mr. Valentin was convicted of conspiracy to distribute cocaine in the quantity charged by the indictment, but the jury could not reach a unanimous verdict as to the racketeering charges. [Dkt. 229 (Jury Verdict)]. The evidence of Mr. Valentin's involvement in drug trafficking was extensive, including judicially authorized wiretaps, pole camera surveillance video footage, and eyewitness testimony. *See* [Dkt. 281 (Pre-Sentence Investigation Report) ¶¶ 8-36]("PSR"). [2] Surveillance footage from two pole cameras installed outside of the "Green Garages," where Mr. Valentin managed the drug conspiracy, showed Mr. Valentin directing his associates, who engaged in hand to hand drug transactions with the steady stream of pedestrians and vehicles approaching the premises. *Id.* at ¶ 12.

Mr. Valentin purchased cocaine in re-distribution quantities and his intercepted phone conversations were explicit in this regard. For example, "…on August 15, 2012 at 3:11 pm, Mr. Valentin placed a call using Target Telephone One to Hector Hernandez Jr., Mr. Valentin asked, "Do you have any of the white available," to which Mr. Hernandez asked, "Who's speaking?" Mr. Valentin stated, "Tato, Tato," and Mr. Hernandez responded, "I just have a half . . . I've got half a gram." Mr. Valentin stated, "No, no, man. It's for me. I want something big. Do you have anything? I am looking for at least five or eight ounces." *Id.* at ¶ 13. Mr. Valentin agreed to a price of $1,000 per ounce for four ounces of cocaine from Mr.

---

[2] At sentencing, the Court canvassed Mr. Valentin as to whether he was interviewed by Probation in the presence of his counsel, whether he read the presentence report and whether he disagreed with any of the facts as stated in the presentence report. [Dkt. 317 (Sent. Hr'g Tr.) 04:13-05:10]. Neither the Defendant, nor defense counsel, nor the Government had any objections to the facts as stated in the PSR. *Id.* at 04:13-05:10. The Court adopted the PSR as its findings of fact. *Id.* at 58:19-58:22.

3

Hernandez's source. *Id.* Then, just a few days later, police observed Mr. Valentin traveling to Springfield, Massachusetts to procure another 100 grams of cocaine. *Id.* at ¶ 17.

While the criminal investigation into Mr. Valentin's trafficking activities was ongoing, Javier Reyes was stabbed to death outside of the front door of his apartment in New London on September 12, 2012. *Id.* at ¶ 27. At sentencing, the Court found by a preponderance of the evidence that Mr. Valentin commissioned the assault on Mr. Reyes. [Dkt. 317 (Sent. Hr'g Tr.) 51:11-53:02]. Mr. Valentin considered the victim's sister, Marisol Reyes, as his wife for the last twenty-eight years. [PSR ¶ 79].

On the day before the homicide, Mr. Valentin received a call from Nestor Pagan at the same time Mr. Pagan and Maaseiyah Williams arrived at the Green Garages, and then Mr. Pagan and Mr. Valentin engaged in an animated conversation. *Id.* ¶ 29. Mr. Williams then called Andrew Aviles and both Mr. Pagan and Mr. Williams were in touch with Jose Rosado, Jr. and Mr. Aviles on the day of the assault. *Id.* Mr. Pagan, Mr. Rosado, and Mr. Aviles, later joined by Mr. Williams, were driven to the victim's apartment complex where they waited for Mr. Reyes to appear. *Id.* ¶¶ 30-31. At the opportune moment, Mr. Rosado struck the victim with a baseball bat and Mr. Aviles stabbed him. *Id.* ¶ 32. Mr. Pagan then called Mr. Valentin. *Id.* ¶ 33. In an intercepted telephone conversation the following day, Mr. Valentin was asked:

> "How many did they give him, one?" Mr. Valentin responded, "They told me they just have him one stabbing." (sic) Mr. Valentin then stated, "Screw it, with all the things that they have done to me, what do you think?" Mr. Valentin

4

also added, "That's so they don't fuck with me. They can have it now, if I start moving pieces around, here's 1,000, here's 2,000, take 5,000, huh? For the people to take charge in New London, man."

PSR ¶ 34.

Upon his conviction for the trafficking offense, Mr. Valentin and the Government entered into a sentencing agreement which stipulated to an adjusted offense level of 35 of under the U.S. Sentencing Commission Guidelines, and a Criminal History Category of either I or II. [Dkt. 272 (Sent. Agreement) at 2-3]. In exchange for the promises made by Mr. Valentin, the United States and the State of Connecticut agreed that the sentence would fully satisfy Mr. Valentin's criminal liability for the conduct charged in the indictment, in other words, that neither the United States nor the State would retry him for charges in connection with Mr. Reyes's homicide following the mistrial declared on counts 1-3. *Id.* at 4-5. After canvassing Mr. Valentin to determine whether he knowingly and voluntarily agreed to enter into the sentencing agreement to waive certain rights, the Court accepted the agreement. [Dkt. 275 (Hr'g Audio)].

At sentencing, the Court addressed the flagrant nature of Mr. Valentin's trafficking activities, which amounted to managing a retail drug operation that plagued a small city. [Dkt. 317 (Sent. Hr'g Tr.) 49:07-51:10, 54:07-55:01]. Mr. Valentin projected himself as a kingpin. *Id.* The Court found that he commissioned the assault on Mr. Reyes by a preponderance of the evidence. *Id.* at 52:13-53:06. The Court noted that Mr. Valentin consistently used threats of violence since he was a teenager. *Id.* at 53:07-53:17. The parties, the Probation Office, and the Court all agreed with the accuracy of the guideline stipulation set forth in the sentencing

5

agreement and applying a Criminal History Category of I. *Id.* at 55:10-55:16. The Court considered the 18 U.S.C. § 3553(a) sentencing factors and determined that a guideline sentence of 201 months imprisonment, followed by a four-year period of supervised release, was sufficient but not greater than necessary to fulfill the purposes of sentencing. *Id.* at 57:04-57:13.

Mr. Valentin did not appeal his sentence. However, three months later, Mr. Valentin filed a motion to vacate his sentence as a separate civil action brought under 28 U.S.C. § 2255. [*Valentin v. United States*, 3:17-cv-1543-VLB]. Mr. Valentin raised five claims, principally, that he was denied effective assistance of counsel and that the Court impermissibly considered Mr. Reyes's homicide when imposing the sentence. The Court rejected Mr. Valentin's claim that his counsel violated the *Strickland* standard. [Dkt. 320 at 10-14]. As to sentencing, "[a]part from his stipulation that he used violence or directed the use of violence, there was ample evidence before the Court to show by a preponderance of the evidence that Mr. Valentin directed the fatal assault on his brother in law, supporting the two-level addition pursuant to U.S.S.G. §2D1.1(b)(2)." *Id.* at 17. The Court, therefore, denied Mr. Valentin's motion to vacate his sentence in a memorandum of decision dated September 1, 2020. Mr. Valentin filed a notice of appeal but he moved to withdraw the appeal before the appellate clerk docketed it. *See Valentin v. United States*, Docket No. 20-3467, ECF No. 40 (2d. Cir. Oct. 27, 2020)(Mandate of Second Circuit administratively closing appeal).

II.      Defendant's motion for compassionate release

Mr. Valentin now moves for re-sentencing pursuant to the statutory

6

exception for "extraordinary and compelling reasons," referred to as compassionate release. 18 U.S.C. § 3582(c)(1)(A). On or around August 27, 2020, Mr. Valentin submitted a request to the warden of FCI Loretto requesting that the Bureau of Prisons ("BOP") file a motion for compassionate release on his behalf. [Dkt. 328-7 (Warden Moser Resp. Ltr.)]. Warden Moser denied Mr. Valentin's request, citing the BOP's policy for medical eligibility for compassionate release. *Id.*

Mr. Valentin filed medical records showing that he tested positive for COVID-19 on December 5, 2020 and was asymptomatic from the virus. [Dkt. 328-2, Sealed Med. R. (12/05/2020 COVID-19 test note)]. While it is unclear from the medical records as to when Mr. Valentin recovered, he was monitored by medical staff and did not have a fever, shortness of breath, or coughing but he had a headache. [*Id.* at 23 (12/07/2020 Med. Note) and 22 (12/09/2020 Med. Note)].

Mr. Valentin's medical records reflect that he is clinically overweight with a Body Mass Index ("BMI") of 29.6. [*Id.* at 36 (02/11/2019 Inter-Facility Transfer Med. Note)]; [*Id.* at 29-31 (Health Prob. List)](same). Mr. Valentin argues that seventy percent of the time his blood pressure reading is either in the "Hypertension Stage I" or in the "elevated" category, although a review of the BOP records shows that he has not been diagnosed with and has not been treated for hypertension. [Dkt. 327 (Def. Mem. in Supp.) at 7]; *compare to* [Dkt. 328-2, Sealed Med. R. (02/12/2019, Health Screen)]("Hypertension: Denied"). He is currently being managed for lower back pain, gastro-esophageal reflux disease (without esophagitis) ("GERD"), and dental issues. [*Id.* at 29-31 (Health Prob. List)].

7

Mr. Valentin also filed a copy of his institutional disciplinary and transfer records as required by the Court's standing order. [Dkts. 328- 3-4, respectively]. According to the disciplinary report, Mr. Valentin was issued a protective mask by prison staff to help reduce the spread of the coronavirus throughout the facility. *Id*. at 2. Inmates were instructed on how to wear their masks and how to request a new mask if their mask is damaged. *Id*. A correctional officer previously warned Mr. Valentin about not wearing his mask properly. Thereafter, the same correctional officer observed Mr. Valentin swinging his mask in his hand while returning from a meal. *Id*. Consequently, in July 2020, Mr. Valentin lost visitation privileges, lost good time credits, and received 14 days in disciplinary segregation, execution suspended, as a sanction for his misconduct. *Id*. at 3.

A review of the BOP's Inmate Locator confirms that Mr. Valentin is designated to FCI Loretto. *See Inmate Locator Service, BOP Registration no. 21569-014*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (Feb. 2, 2021). According to the BOP's Inmate Locator Service, his current release date is August 7, 2027.

FCI Loretto has had mixed results in managing the pandemic. The complex houses 811 inmates, primarily at the low security prison. *FCI Loretto*, Fed. Bureau of Prisons https://www.bop.gov/locations/institutions/lor/ (last accessed Feb. 2, 2021). As of February 8, 2021, 706 inmates have been infected with the virus, but every inmate has now recovered and there have been no fatal cases. COVID-19 Dashboard, Fed, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last

updated Feb. 8, 2021).[3] The BOP reports that 115 staff members and 65 inmates at FCO Loretto are now fully vaccinated, meaning they have received both doses of the two vaccines now approved under Emergency Use Authorization from the Food and Drug Administration. *Id.*

If released, Mr. Valentin proposes to live with his brother in Pennsylvania, where he would work as a landscaper. [Dkt. 311 (Def. Suppl. Mem.)].

### Legal Standard

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute codifying the rule of finality states:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The specific provision under which Defendant seeks relief from his sentence, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018,

---

[3] Based on this statistic, Mr. Valentin has likely recovered too. The Court notes that his last medical note is dated shortly after his infection and suggests, at that point, a favorable prognosis.

9

imposes procedural prerequisites to filing a motion for resentencing to provide compassionate release. First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)). Previously, only the BOP could move for compassionate release and such motions were rarely filed. *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020). The First Step Act amendments were intended to address past inaction by the BOP by removing the BOP as the sole arbiter of compassionate release, while still permitting the BOP to weigh-in on a defendant's request via the statute's exhaustion of administrative remedies requirement. See *id*. at 232; *see also United States v. Gamble*, No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020)(explaining the policy purpose behind the exhaustion requirement in this context).

Recently, in *Brooker,* the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release. 976 F. 3d at 234-36. In short, the statute only requires courts to consider "applicable" statements issued by the U.S. Sentencing Commission and the relevant policy statement, U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP. *Id.* at 235-36. In other words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release." *Id.* at 236. Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might

10

bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id.* at 237.[4]

Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020). The district courts have broad discretion in deciding whether to grant or deny a motion for compassionate release. *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020); *see also* § 3582(c)(1)(A) ("[T]he court…may reduce the term of imprisonment...").

### A. Whether Mr. Valentin exhausted administrative remedies

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must either "…fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

---

[4] The Government's initial opposition brief argued that *Brooker* was wrongly decided. [Dkt. 323 (Gov. Mem. in Opp'n) at 7]. The Government requested that the Court refrain from ruling on Mr. Valentin's motion to the extent the Court would rely on *Brooker* until the Second Circuit heard the Government's motion for rehearing *en banc* in *Brooker*. *Id.* The Second Circuit denied the Government's motion for rehearing *en banc* on December 9, 2020 and the mandate issued thereafter. *United States v. Brooker (Zullo)*, 19-3218-cr ECF. No. 104 (2d. Cir. Dec. 9, 2020). There has been no intervening change in U.S. Supreme Court precedent and *Brooker* remains binding authority. The Government's request is therefore moot.

(emphasis added). Thus, a defendant need not exhaust all available administrative appeals of the warden's denial of the request, so long as defendant waits thirty days before seeking judicial relief.

Here, the parties and the Court now agree that Defendant exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A). *See* [Dkt. 332 (Gov. Sec. Mem. in Opp'n) at 6]. Mr. Valentin established that he first requested that the BOP move for compassionate release in August 2020, as memorialized by the warden's September 2020 response. [Dkt. 328-7 (Warden Moser Resp. Ltr.)]. The BOP has had the opportunity to consider the factual basis for Defendant's requested sentence reduction, which is now properly before the Court.

### B. Whether "extraordinary and compelling reasons" exist to warrant a sentence reduction

Section 3582(c)(1)(A) does not define what constitutes "extraordinary and compelling reasons" and, under *Brooker*, district courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F.3d at 237. Mr. Valentin argues that his high blood pressure, hypertension, chronic back pain and his BMI of 29.6 place him at heightened risk for severe illness from COVID-19 should he become re-infected. [Dkt. 327 (Def. Mem. in Supp.) at 1]. The Government argues that Mr. Valentin's risk of re-infection is speculative, but appears low, and that his medical records do not conclusively establish that he is at a medically recognized risk of severe infection. [Dkt. 332 (Gov. Sec. Mem. in Opp'n) at 6-8]. The Court agrees with the Government.

This Court and others have recognized that the prevention of infection from

COVID-19 may constitute "extraordinary and compelling" reasons to grant compassionate release where the defendant has a medical condition recognized by the CDC to heightened the risk of developing severe complications from COVID-19, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting motion for compassionate release where defendant suffers from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United States v. Miller*, No. 3:15-CR-132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020)(granting motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, 466 F. Supp. 3d 310, 315 (D. Conn. 2020); *see also, United States v. Adams*, No. 3:16-CR-86-VLB, 2020 WL 3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020). In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. S2 18 CR. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)(citations omitted).

13

For the last several months, the CDC has classified underlying health conditions that correlate to an increased risk of severe complications from contracting COVID-19 into two categories; conditions that are known to cause an increased risk of severe illness and those that might increase a person's risk. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Feb. 3, 2021). The conditions listed are regularly updated as the CDC reviews new scientific research. *Id*.

None of the conditions evidenced by Mr. Valentin's medical records are among those where the CDC has found a definitive correlation to severe infection from COVID-19. Mr. Valentin's BMI classifies him as overweight, which the CDC identifies as a possible risk factor for severe illness. *Id*. While the BOP medical records do not reflect that he is diagnosed or has been treated for hypertension, assuming defense counsel's interpretation of Mr. Valentin's blood pressure readings are correct, Mr. Valentin's high blood pressure would be another potential risk factor for severe illness. *Id*. The CDC does not consider back pain or GERD as a potential risk factor for severe illness. Thus, the Court concludes that although Mr. Valentin may have some medically recognized heightened susceptibility to the virus, his own experience with the virus establishes that it has not had a severe effect on him.

Mr. Valentin argues that his successful bout with the virus does not establish that he would fare as well if he were to become re-infected. Based on information from the CDC, cases of re-infection from COVID-19 have been reported but remain

rare. *Reinfection with COVID-19*, Ctrs. for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last updated Oct. 27, 2020).

Mr. Valentin cites an academic article from *The Lancet Infectious Diseases*, which compares the outcomes of four patients who have been re-infected with COVID-19 worldwide: one had an asymptomatic re-infection, another had a milder case, another a worse case, and another was hospitalized.  Akiko Iwasaki, *What Reinfections Mean for COVID*, 21 THE LANCET INFECTIOUS DISEASES, 1 (Jan. 01, 2021), available at https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30783-0/fulltext.  Given the small sample size, the article does not offer conclusive or predictive evidence that re-infection would be widespread or particularly severe.

Some Courts have found that the risk of re-infection is sufficiently clear, or, perhaps, because immunity from future infection is uncertain for particularly vulnerable inmates, to find "extraordinary and compelling reasons" to warrant a sentence reduction, whereas other courts have rejected the argument. *Compare United States v. Smith*, No. 7:03-CR-00135, 2020 WL 7407489, at *4 (W.D. Va. Dec. 17, 2020)(citing examples) to *United States v. Davis*, No. 12-CR-712 (SHS), 2020 WL 3790562, at *3 (S.D.N.Y. July 7, 2020)(citing examples).

In *Davis*, the district court found that the risk of reinfection was too speculative to warrant a sentence reduction for a defendant with hypertension who had previously contracted COVID-19 and experienced mild to moderate symptoms. The district court reasoned that the speculative nature of the defendant's risk of

15

re-infection conflicted with the purpose of 18 U.S.C. § 3582(c)(1)(A) to provide a narrow exception from the finality of a sentence once imposed. *Id.* (citing *Freeman*, 564 U.S. at 526 (2011)). The Court agrees.

The scientific possibility of re-infection is a matter of significant public concern. The prospect of re-infection is complicated by the rollout of vaccinations which provide a strong degree of immunity and the possibility that new variants of the coronavirus could evade immunity. However, at present, the Court finds that Mr. Valentin has not established his burden of showing that the possibility that he becomes re-infected and that he would experience a worse outcome constitutes "extraordinary and compelling reasons" to reduce his sentence.

The Court also considers conditions at Mr. Valentin's place of confinement. While the cumulative infection rate at FCI Loretto is exceedingly high, the worst appears to be over, as there are no active cases among inmates. Moreover, despite most inmates contracting the coronavirus at the facility, there have been no fatal cases there. This suggests that prison officials were successful at treating those who were symptomatic and would succeed again should some inmates become re-infected.

Dr. Meyer's expert declaration filed in an unrelated case during the early weeks of the pandemic is unpersuasive. [Dkt 328-8 (Meyer Decl.)]. Her declaration provides analysis of ICE-detention facilities in New York and prison conditions generally. It provides no analysis of current conditions at FCI Loretto, the risk of re-infection, or the effect of vaccinations. Moreover, her dire prediction that inmates would suffer because the health system would be overwhelmed by severe

16

COVID-19 cases has not come to fruition.

Considering conditions at FCI Loretto, Mr. Valentin has not done his part in slowing the spread of the infection. Instead, he acted in a cavalier manner by disregarding prison officials' mask mandate, despite being previously instructed on how to wear a mask and being warned for prior non-compliance. His excuse at the disciplinary hearing reflects a failure to appreciate how his actions jeopardized the safety of other inmates and staff: he admitted to taking off his mask because it was too tight and he called an inmate witness who confirmed that Mr. Valentin was not wearing a mask because he said it was uncomfortable. Although Mr. Valentin has taken advantage of occupational training available through the BOP and is now held at a low security prison, his willingness to disregard the safety of others for his own convenience remains an overarching concern.

This case is distinguishable from the four cases the Defendant cites for the proposition that "extraordinary and compelling reasons" may lie in the conditions of confinement attendant to the pandemic, absent medical vulnerability. Each of the cases he cites rests on the unique circumstances of the defendant, none of which are present here: *United States v. Lizardi*, 2020 U.S. Dist. LEXIS 188147, *7 (S.D.N.Y. Oct. 9, 2020)(the district court characterized the case as 'unusual' because the defendant renounced his gang affiliation years before sentencing and had, effectively, five months remaining on his custodial sentence before being placed in a half-way house); *United States v. Rodriguez*, No. 00 CR. 761-2 (JSR), 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020)(defendant, who was also medically vulnerable to COVID-19, filed letters of support from 27 members of the prison staff

17

attesting to defendant's exceptional character, which showed that he used his time in "prison not just to better himself but also to better his community."); *United States v. Wooten*, 2020 U.S. Dist. LEXIS 191940, *21 (D. Conn. Oct. 16, 2020) (*inter alia*, the defendant had 10 months remaining on his sentence, the Government interrupted his participation in the RDAP program by calling him as a witness in a grand jury proceeding, which negatively affected his potential release date); *United States v. Sturdivant*, 3:12-cr-74, ECF. No. 1349 at 12-13 (D. Conn. Nov. 23, 2020)(the district court characterized the case as a "close call," where defendant had served 90% of his sentence). The Court agrees that the conditions of confinement attendant to the pandemic factor in the Court's analysis, but Mr. Valentin does not present a compelling case of extraordinary rehabilitation and has six years and six months, or about 40%, of his sentence remaining.

The current pandemic presents an especially difficult period for incarcerated people, including Mr. Valentin. But his conditions of confinement, in combination with his personal characteristics and the duration of his sentence remaining, do not warrant modification of his sentence because it is neither an "extraordinary" nor "compelling" reason for a sentence reduction.

I. § 3553(a) sentencing factors

Because the Court concludes that Mr. Valentin did not carry his burden of establishing "extraordinary and compelling" reasons to modify his sentence, the Court will only briefly discuss why the § 3553(a) sentencing factors further militate against granting Mr. Valentin's motion for compassionate release. The Court's balancing of the § 3553(a) sentencing factors remains unchanged since

sentencing.

First, the sentence in this matter reflected the seriousness of the offense. Mr. Valentin projected himself as a drug kingpin and resorted to senseless violence for personal benefit. His conduct was exploitative and pernicious. Even now, amid a lethal pandemic, Mr. Valentin placed his convenience and comfort over the safety of others.

A sentence of time served or a reduction of his sentence to some other degree would not promote respect for the law or provide just punishment for the offense, considering his circumstances now and at sentencing. Instead, it would signal to Mr. Valentin and others that they may evade responsibility by invoking temporary hardships attendant to incarceration during the pandemic. While Mr. Valentin has made some strides by engaging in available BOP programing and interacting appropriately with staff and other inmates, warranting transfer to a lower security facility, his modest rehabilitation is outweighed by the other policy considerations embodied in § 3553(a).

Under these circumstances and after considering each of the § 3553(a) factors, the Court cannot conclude that the remaining portion of his custodial sentence is futile. Therefore, even if extraordinary and compelling reasons for a sentence modification existed, there is no sentence modification that would comport with the purpose of sentencing as set forth in § 3553(a).

## Conclusion

For the above stated reasons, the Court DENIES Mr. Valentin's renewed motion for a reduction of his sentence to provide for compassionate release

pursuant to 18 U.S.C. § 3582(c)(1)(A).

The Court orders the Clerk to unseal: Dkt. 328-3,4 and 6-7. These sealed exhibits were unaccompanied by a motion to seal pursuant to Local Rule of Criminal Procedure 57(e)(3). As noted by the Court's standing order on compassionate release, medical records are typically filed under seal pursuant to the applicable local rules. [Dkt. 322 (Standing Order) at 2]. The institutional disciplinary and transfer records and Dr. Meyer's declaration do not contain any information which would be subject to the sealing rule. The Defendant's medical records, Dkts. 328, 328-1 and 328-2 shall remain under seal. This order is based on the Court's finding that the materials to be sealed contain confidential information concerning Defendant's medical condition. *See* Health Insurance Portability and Accountability Act of 1996; Local R. Crim. P. 57(e)(3) ("A statute mandating or permitting the non-disclosure of a class of documents (e.g., personnel files, *health care records*, or records of administrative proceedings) provides sufficient authority to support an order sealing such documents.")(emphasis added). The Defendant's BOP re-entry report, Dkt. 328-5, shall be refiled by the Clerk on the public docket with the Defendant's date of birth redacted. Fed. R. Crim. P. 49.1(a)(2).

                                              IT IS SO ORDERED.

                                              _____/s/_____
                                              Hon. Vanessa L. Bryant
                                              United States District Judge

**Dated this day in Hartford, Connecticut: February 8, 2021**